[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-12333
Non-Argument Calendar
_____

D.C. Docket No. 2:13-cv-00691-JES-CM

DAVID M. SPELLBERG,

Plaintiff–Appellant,

versus

NEW YORK LIFE INSURANCE COMPANY,

Defendant–Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(May 25, 2016)

Before HULL, MARCUS, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Plaintiff Dr. David M. Spellberg ("Plaintiff") appeals the district court's order granting summary judgment to Defendant New York Life Insurance Company ("Defendant") on Plaintiff's claim for benefits under an overhead-expense insurance policy.  Plaintiff seeks reimbursement for his medical practice's overhead expenses, which he says he incurred while disabled.  The district court concluded that the company that owned Plaintiff's practice incurred those expenses, not Plaintiff.  After careful review, we affirm.

## I.    Background

Plaintiff used to own a urology practice called Naples Urology Associates, P.A., which consisted of a main office in Naples, Florida, and two satellite offices. In 2004, Plaintiff became an insured under a physicians' group disability-insurance policy ("Policy") issued by Defendant to the American College of Surgeons Insurance Trust.  The Policy provides office overhead-expense insurance to cover "Eligible Expenses" an insured incurs while totally disabled, as long as each Eligible Expense is enumerated in the "Eligible Expenses" section, is not excluded under the Policy, is a normal and customary expense of the insured member, and is generally accepted as tax deductible.

According to the Policy, Eligible Expenses encompass costs "only to the extent outlined" in the plan.  These expenses include business equipment loans and leases, depreciation of office furniture and equipment, employee salaries, insurance

2

premiums, maintenance, other normal and customary fixed expenses (such as license fees, subscriptions, membership dues, and accountant services), rent, and utilities. The Policy excludes personal expenses, salaries of people hired after the insured becomes disabled, and purchases of office equipment. If an insured properly makes a claim, the benefit payable is the lesser of the actual amount of Eligible Expenses incurred or the monthly benefit in force on the date the insured's total disability began. Plaintiff's maximum monthly benefit was $20,000.

In January 2010, Plaintiff sold Naples Urology and all of its assets to 21st Century Oncology ("21st Century"), including all tangible assets, leases, and patient files and records, for about $214,000. 21st Century further assumed "liabilities and obligations under any agreement or contract entered into in the ordinary course of business" and which "relate to rent, or goods or services sold or provided after the Closing."

Plaintiff then entered into an Employment Agreement with 21st Century that provided for an initial two-year term of employment and established that Plaintiff and 21st Century would "be in an employer/employee relationship." Plaintiff agreed to continue providing medical services at his three office locations, but 21st Century became responsible for billing and collection, and it agreed to provide Plaintiff office space, computer hardware and software, computer support

3

personnel, nursing, staff and scheduling support, a cell phone, and other supplies.

21st Century also maintained medical malpractice insurance on Plaintiff's behalf.

With respect to Plaintiff's compensation, 21st Century agreed to pay

Plaintiff a base salary equal to 100% of his "Net Profits." The Employment

Agreement defined "Net Profits" as

> Net Revenues decreased by the direct costs . . . incurred by 21st
> Century in connection with the medical services personally performed
> or supervised by you at the Office including, without limitation, rent,
> taxes, utilities, supplies, capital (other than goodwill) and equipment
> acquisition costs  . . . , staff salaries and benefits, your fringe benefits,
> the costs of your CME and medical malpractice insurance premiums,
> administrative expenses, such as accounting, legal, human resources,
> and billing and collection.

"Net Revenues" were defined as "all revenues of 21st Century . . . attributable to

professional services personally performed or supervised by you." 21st Century

further promised not to incur expenses above the average expenses Plaintiff had

incurred in the two years before he sold his practice. In the first year, the firm

would advance Plaintiff's base salary by paying him, in bi-weekly installments,

75% of the income he earned for the year prior to his employment with 21st

Century. In subsequent years, the advance would amount to 75% of the previous

year's base salary. After each quarter, 21st Century would reconcile the estimated

base salary with Plaintiff's actual quarterly earnings. If the actual base salary

exceeded the estimated base salary, 21st Century would pay Plaintiff the

difference. If 21st Century overpaid the estimated base salary, it would deduct the

4

overpayment from the next salary payment.  The Employment Agreement also provided for bonus compensation separate from the base salary.

After entering into the January 2010 Employment Agreement, Plaintiff worked as an employee of 21st Century until July 2012, when he became disabled following neck surgery.  Plaintiff was unable to perform any medical services, but 21st Century continued to operate the practice at a loss.  Meanwhile, Plaintiff was paid a base salary averaging around $25,000 per month until the Employment Agreement terminated at the end of December 2012.

Plaintiff submitted a claim under the Policy for $100,000 in contractual benefits (the sum of the maximum monthly benefit of $20,000 for August 2012–December 2012) to cover expenses he says he incurred while he was disabled despite having sold his practice.  Plaintiff points out that he had earned $36,612.62 in net profits as of June 30, 2012, just before he became disabled, and that 21st Century owed him a bonus payment of $106,941.96 in December 2012.  But because Plaintiff's practice operated at a loss in 2012, 21st Century never distributed approximately $143,500 due to Plaintiff.  And 21st Century's loss still amounted to $489,492.47.

Defendant denied the claim because it believed Plaintiff did not incur Eligible Expenses.  Defendant reasoned that because Plaintiff no longer owned his practice and was instead an employee of 21st Century, he could not claim expenses

under the Policy.  Plaintiff sued for benefits, but the district court concluded as a matter of law that 21st Century incurred the expenses, not Plaintiff.  Plaintiff appeals.

## II.    Discussion

"We review a district court's grant or denial of summary judgment *de novo*, considering all the facts and reasonable inferences in the light most favorable to the nonmoving party."  *Norfolk S. Ry. Co. v. Groves*, 586 F.3d 1273, 1277 (11th Cir. 2009).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Both parties cite Florida law as governing the interpretation of the Policy. Under Florida law, the interpretation of an insurance contract is a question of law to be determined by the court.  *See Graber v. Clarendon Nat'l Ins. Co.*, 819 So.2d 840, 842 (Fla. Dist. Ct. App. 2002).  "Where the language in an insurance contract is plain and unambiguous, a court must interpret the policy in accordance with the plain meaning so as to give effect to the policy as written."  *Wash. Nat'l Ins. Corp. v. Ruderman*, 117 So.3d 943, 948 (Fla. Dist. Ct. App. 2013).  Courts should also

read the policy as a whole, giving every provision its full meaning and operative effect. *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So.2d 871, 877 (Fla. 2007).

The determinative issue here is whether Plaintiff or 21st Century incurred the overhead expenses. The parties agree that "to incur" means "to be liable for" or "to have to pay for." Plaintiff argues that he continued to incur expenses even after he sold his practice to 21st Century because he was obligated to generate revenue sufficient to cover the practice's overhead before he earned a base salary. It is true that the compensation formula took into account these expenses, but that did not mean that Plaintiff incurred them. The Employment Agreement even states that for the purpose of compensation, "'Net Profit' shall mean Net Revenue decreased by the direct costs . . . *incurred* by 21st Century," including rent, utilities, and other overhead expenses. And 21st Century agreed that it would not "*incur* expenses over and above the average historical expenses *incurred by you* for the two (2) year period immediately preceding your employment hereunder." The way the Employment Agreement contrasts who incurred expenses before and after the sale confirms that 21st Century became responsible for paying overhead and that expenses were considered only for the purpose of calculating Plaintiff's salary. Moreover, it is evident from the terms of the Employment Agreement that 21st Century agreed to provide Plaintiff office space, supplies, and support staff. And under the asset-purchase agreement, 21st Century assumed Plaintiff's

7

liabilities, including a lease and contracts for goods and services, and 21st Century in fact did pay rent and other overhead.

Plaintiff insists that he nevertheless incurred expenses because 21st Century kept about $36,000 he had earned through June 2012 and another $107,000 in bonuses that would have been due to him at the end of 2012. Therefore, he reasons that he "was ultimately obligated to pay" expenses. Importantly, however, Plaintiff continued to receive an advance of his base salary while he was disabled, which was calculated using the previous year's profits. So, by the end of the contract, Plaintiff had been disabled for several months while his practice operated at a loss. Normally, if 21st Century determined at the end of a quarter that it had overestimated Plaintiff's base salary, 21st Century would deduct the overpayment from subsequent salary payments. But because Plaintiff's contract expired at the end of 2012, 21st Century could not reconcile Plaintiff's actual base salary in the final two quarters of 2012 over subsequent salary payments; instead it kept previously earned profits and bonus payments Plaintiff normally would have been entitled to. Whether or not 21st Century properly kept the accrued salary and bonus under the Employment Agreement, Plaintiff was not liable to 21st Century for the balance of its $489,000 loss. Rather, 21st Century kept these salary and bonus payments to adjust his compensation given that he generated no revenue in the final two quarters of 2012. As the district court put it, "The fact that

[Plaintiff's] compensation formula factored in expenses did not cause the expenses to be 'incurred' by [him]. . . . While expenses had the effect of reducing [Plaintiff's] compensation, [Plaintiff] did not become liable for the expenses and did not directly pay any of the expenses."[1]  Consequently, the district court properly granted summary judgment to Defendant.

## III.    Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

**AFFIRMED.**

---

[1] Defendant cites a handful of cases for the proposition that Plaintiff could not incur expenses after he sold his practice.  We do not read these cases to hold that someone who sells his practice could never be covered under an overhead-expense insurance policy.  Rather, the cases simply interpreted the language of the particular policies at issue requiring expenses to have been incurred in the "operation" of an insured's business.  *See Paul Revere Life Ins. Co. v. Klock*, 169 So.2d 493, 495 (Fla. Dist. Ct. App. 1964) (dentist's expenses not covered under policy that required expenses to be incurred "in the operation of his office" because he had ceased operations and let a doctor set up practice in his old office space); *Chenvert v. Paul Revere Life Ins. Co.*, No. Civ. 03-0330-SLR, 2004 WL 1739718, at *4 (D. Del. Aug. 2, 2004) (dentist's claim for expenses incurred after he ceased operation of his business not covered because policy provided coverage only for expenses incurred while the insured's business was in "operation"); *Twin Tiers Eye Care Assocs., P.C. v. First Unum Life Ins. Co.*, 270 A.D.2d 918, 918 (N.Y. App. Div. 2000) (employee's expenses not incurred "in the operation of" his office because he did not own the practice); *see also Lincoln Dental Arts Clinic, Ltd. v. Mut. Life Ins. Co. of N.Y.*, No. 92 C 3661, 1993 WL 239020, at *3–4 (N.D. Ill. June 28, 1993) (dentist's expenses covered for period of his disability, even though he sold his practice after becoming disabled, because policy required only that he be a shareholder of the practice at the *beginning* of his disability).